UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| IDEXX LABORATORIES, INC., | ) |
| Plaintiff | ) |
| v. | ) 2:22-cv-00056-JDL |
| GRAHAM BILBROUGH, | ) |
| Defendant | ) |

## RECOMMENDED DECISION ON
## DEFENDANT'S MOTION TO DISMISS

Plaintiff alleges that Defendant, a former employee, will necessarily misappropriate its trade secrets in his current employment in violation of the federal Defend Trade Secrets Act and the Maine Uniform Trade Secrets Act. (Complaint, ECF No. 1.) Plaintiff seeks to enjoin Defendant from disclosing Plaintiff's trade secrets and from working on product offerings to which the trade secret information would be relevant.

Defendant has moved to dismiss Plaintiff's complaint.[1]  (Motion, ECF No. 29.) Defendant contends Plaintiff has failed to assert an actionable federal claim, and, therefore, dismissal of Plaintiff's complaint, including Plaintiff's state law claims, is warranted.

Following a review of the parties' submissions I recommend the Court grant the motion to dismiss.

---

[1] Plaintiff originally asserted claims against Defendants Graham Bilbrough, and Melissa LaPointe. Both defendants filed the present motion. Plaintiff voluntarily dismissed its claims against Ms. LaPointe. (Notice of Voluntary Dismissal Without Prejudice, ECF No. 33.) This recommended decision addresses the remaining claims against Defendant Bilbrough.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from Plaintiff's complaint. A plaintiff's factual allegations are generally deemed true when evaluating a motion to dismiss. *See McKee v. Cosby*, 874 F.3d 54, 59 (1st Cir. 2017) (considering a motion to dismiss pursuant to Rule 12(b)(6)); *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) (considering a motion to dismiss pursuant to Rule 12(b)(1)).

Plaintiff develops, manufactures, and distributes products and services for the companion animal veterinary, livestock and poultry, water testing, and dairy sectors. (Complaint ¶ 9.) Defendant worked for Plaintiff in various high-level roles from October 2006 until his resignation on January 27, 2022. (*Id*. ¶ 16.) For most of his employment with Plaintiff, Defendant worked within IDEXX's Companion Animal Group Medical Organization. Most recently, Defendant held the title of Associate Director, Global Medical Strategy and Innovation and reported directly to Plaintiff's Vice President and Chief Medical Officer. (*Id*. ¶ 18.) From January through September 2021, Defendant worked as the Director Associate Fellow, in Plaintiff's Corporate Strategy Group. (*Id*. ¶ 19.)

Among Plaintiff's products in the veterinary diagnostic sector are its fecal antigen tests (the "IDEXX Antigen Products") and fecal PCR tests (the "IDEXX PCR Products"), which tests assist veterinarians in the detection of fecal parasites in a stool sample (collectively, the "IDEXX Fecal Solutions"). (*Id*. ¶ 14.) Another product in the veterinary diagnostic sector is its point-of-care hematology test, which allows veterinarians to perform in-office blood tests without the need for an outside lab. (*Id*. ¶ 15.)

During his employment with Plaintiff, Defendant acquired knowledge of Plaintiff's proprietary and trade secret information, including but not limited to Plaintiff's strategic business assessments, prioritization planning, and its research and development portfolio and product roadmap for a variety of Plaintiff's current and future product offerings. (*Id.* ¶ 20.) Defendant worked with Plaintiff's research and development team, including in the analysis of the marketability of various product lines and in the development of veterinary products, including the IDEXX Fecal Solutions. (*Id.* ¶ 21.)

In his work, Defendant acquired knowledge of confidential product testing results concerning the IDEXX Antigen Products and Plaintiff's efforts to improve the IDEXX Antigen Products, including the efforts to expand the number and type of parasites identified by the IDEXX Antigen Products and to develop new ways for veterinarians to run antigen tests. (*Id.* ¶ 22.) Plaintiff considers its product development plans and internal data regarding its IDEXX Fecal Solutions to be trade secrets (the "IDEXX Fecal Solutions Trade Secrets"). (*Id.*)

Defendant was also involved in the development of Plaintiff's Clinical Decision Support ("CDS") project that explores cutting-edge ways to use data analytics to help veterinarians interpret symptoms and test results to make better clinical decisions. (*Id.* ¶ 23.) Plaintiff considers its product development plans and internal data in Clinical Decision Support to be trade secrets (the "CDS Trade Secrets"). (*Id.*) In his 2021 self-evaluation, Defendant described his role in CDS's strategic direction and development: "I have helped build the vision for Clinical Decision Support ['CDS']. (*Id.* ¶ 24.) Rather than a collection of 'interpretation tools,' I have shown the path to a reimagination of how

veterinarians consume diagnostic information and respond.  (*Id.*)  In CDS, I was integral to the project that 'painted the picture' and lead to [Plaintiff]'s first significant financial investment….  For much of 2021, I was the *de facto* Clinical Product Manager."  (*Id.*)

Defendant was also involved in a confidential project for Plaintiff to develop the next generation of veterinary diagnostic tests by identifying gaps and opportunities in the veterinary sector (the "Unmet Needs Project").  (*Id.* ¶ 25.)  Through the Unmet Needs Project, Defendant had access to Plaintiff's confidential and proprietary marketing and clinical information gathered to validate Plaintiff's potential strategic priorities, which Plaintiff considers trade secrets (the "Unmet Needs Data Trade Secrets").  (*Id.*)  Defendant also had access to Plaintiff's trade secrets relating to Plaintiff's chemistry development plans for point-of-care diagnostic tests (the "Chemistry Trade Secrets").  (*Id.* ¶ 26.)  In addition, Defendant was involved in the research and development of Plaintiff's oncology product offerings and in developing Plaintiff's product plans in veterinary oncology. (*Id.* ¶ 27.)  Plaintiff considers its research and development activities and plans for future product offerings in veterinary oncology to be trade secrets (the "Oncology Strategy Trade Secrets").  (*Id.*)

Plaintiff has implemented measures designed to maintain its trade secrets as confidential, including marking sensitive documents as "confidential," limiting access to trade secrets to employees who have a need to know the trade secret information, maintaining computer security features and devices to prevent external access to trade secrets, requiring employees to acknowledge a Code of Ethics that requires Plaintiff's confidential information be kept confidential, reminding personnel about the importance

4

of maintaining confidences, and requiring employees to sign agreements that prohibit the disclosure of trade secret information. (*Id.* ¶ 12.) Plaintiff's Code of Ethics requires that employees "[s]afeguard confidential information from public disclosure." (*Id.* ¶ 13.)

Defendant resigned from Plaintiff effective January 27, 2022. (*Id.* ¶ 28.) Despite requests from his former colleagues and supervisors, Defendant refused to disclose the identity of his new employer. (*Id.* ¶ 29.) Plaintiff subsequently learned that Defendant is now working for Antech Diagnostics ("Antech"), one of Plaintiff's principal competitors. (*Id.* ¶ 30.) Among other products, Antech offers a fecal PCR test (the "Antech PCR Products") that competes directly with the IDEXX Fecal Solutions in the veterinary diagnostic sector. (*Id.* ¶ 31.) On January 31, 2022, four days after his resignation from Plaintiff, Defendant represented Antech on an American Association of Veterinary Parasitologists Hookworm Taskforce call on which the Antech PCR Products were presented. (*Id.* ¶ 32.)

Plaintiff contends Defendant is working for Antech in a role that is substantively identical to his role at Plaintiff, which role involves the clinical development and strategic planning for Antech diagnostic products, including the Antech PCR Products. (*Id.* ¶ 33.) Plaintiff alleges that given the direct competition between the IDEXX Fecal Solutions and the Antech PCR Products, Defendant could not work on the Antech PCR Products without disclosing and/or using Plaintiff's trade secrets. (*Id.* ¶ 34.) Defendant's knowledge of the IDEXX Antigen Products, Plaintiff asserts, would be invaluable to Antech as it would allow Antech to focus its research and development efforts on areas where it can better compete with Plaintiff. (*Id.*)

5

Plaintiff alleges that in his current employment, Defendant will necessarily misappropriate Plaintiff's trade secrets in violation of the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. §§ 1836 et seq., and the Maine Uniform Trade Secrets Act (MUSTA), 10 M.R.S. §§ 1541 et seq.  Plaintiff seeks injunctive relief prohibiting Defendant from (1) directly or indirectly disclosing or using Plaintiff's trade secret information in his employment with Antech; and (2) directly or indirectly working on Antech product offerings that are competitive with Plaintiff's products "from which [Defendant] derived [Plaintiff's] trade secrets."  (*Id*. PageID #16, ¶¶ A(i)-(ii).)

### LEGAL STANDARD

Defendant argues Plaintiff has failed to allege a federal cause of action.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  In reviewing a motion to dismiss under Rule 12(b)(6), a court "must evaluate whether the complaint adequately pleads facts that 'state a claim to relief that is plausible on its face.'" *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In doing so, a court "assume[s] the truth of all well-pleaded facts and give[s] the plaintiff the benefit of all reasonable inferences therefrom." *Id.* (quoting *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008)).  Defendant also argues that if the Court determines that Plaintiff has not asserted a federal claim, the Court would lack jurisdiction over Plaintiff's state law claim.

**DISCUSSION**

**A. Plaintiff's Misappropriation Claim Under DTSA**

Congress enacted DTSA in 2016 "as a needed update to Federal law" and to "provide a single, national standard for trade secret misappropriation with clear rules and predictability for everyone involved." H.R. Rep. No. 114-529, at 200 (2016). Congress noted that "[w]hile 48 states have adopted variations of the [Uniform Trade Secret Act], the state laws vary in a number of ways and contain built-in limitations that make them not wholly effective in a national and global economy." H.R. Rep. No. 114-529, at 198. Although "'Congress went out of its way to make clear that the DTSA does not preempt state trade secret laws' but 'merely provides a complementary Federal remedy[,]'" that "does not mean that the statutes are the *same*." *Advantage Payroll Servs., Inc. v. Rode*, No. 2:21-cv-00020-NT, 2021 WL 5999187, at *5 (D. Me. Dec. 20, 2021) (quoting *Brand Energy & Infrstr. Servs., Inc. v. Irex Contracting Grp.*, Civil Action No. 16-2499, 2017 WL 1105648, at *7 n.17 (E.D. Pa. Feb. 24, 2017) (emphasis in original).

DTSA defines "misappropriation," in part, as the "disclosure or use of a trade secret of another without express or implied consent by a person who … at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret …." 18 U.S.C. § 1839(5)(B)(ii)(II).

To "prevail on a claim of misappropriation of trade secrets, a plaintiff must show 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a

7

confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

For purposes of his motion to dismiss, Defendant does not contest that the identified information to which he was privy as an employee of Plaintiff was trade secret information, nor does he argue that Plaintiff failed to take reasonable steps to conserve its secrecy. Defendant focuses on the third element of a misappropriation claim, arguing Plaintiff has not sufficiently alleged an actionable "use" of Plaintiff's trade secrets.

Plaintiff has not alleged that Defendant has in fact disclosed or used Plaintiff's trade secret information. Plaintiff instead asserts Defendant inevitably will disclose its trade secrets during his employment with Antech. Plaintiff thus seeks to proceed based on the inevitable disclosure doctrine. Pursuant to the inevitable disclosure doctrine, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him [or her] to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995). In other words,

> a former employee threatens misappropriation of trade secrets simply by holding knowledge of those secrets in their head while working for a direct competitor…. The inevitable disclosure doctrine constitutes a narrow avenue for courts to provide injunctive relief for threatened misappropriation of trade secrets. The doctrine requires a court to recognize and enforce a de facto noncompetition agreement to which the former employee is bound, even where no express agreement exists.

8

*Kinship Partners, Inc. v. Embark Veterinary, Inc.*, No. 3:21-cv-01631-HZ, 2022 WL 72123, at *6-7 (D. Or. Jan. 3, 2022).[2]

Defendant contends that the inevitable disclosure doctrine cannot sustain Plaintiff's claim for injunctive relief under DTSA. Under DTSA, a court may grant an injunction "to prevent any actual or threatened misappropriation," provided the order does not "prevent a person from entering into an employment relationship, and that the conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(ii)(I). Defendant maintains that Plaintiff has alleged no actual threat of misappropriation. Rather, Defendant argues, Plaintiff's claim is based on the information Defendant knows and Plaintiff's concern that Defendant will disclose the information.

One court recently observed that "there is no judicial consensus on whether DTSA permits application of the inevitable disclosure doctrine." *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 331 (D. Conn. 2021). The lack of consensus appears to be the product of courts assessing the doctrine without distinguishing between recovery under DTSA or a similar, but not identical, state trade secrets act. *See, e.g., Fres-co Sys. USA, Inc. v. Hawkins*, 690 Fed. App'x 72, 76 (3d Cir. 2017) (applying DTSA and Pennsylvania Uniform Trade Secret Act); *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, *5-7 (N.D. Ill. May 11, 2017) (applying DTSA

---

[2] One court has explained, "an alternative reading of the inevitable disclosure doctrine is that it is just one way of showing a threatened disclosure." *Barilla Am., Inc. v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069, *9 (S.D. Iowa July 5, 2002).

and Illinois Trade Secrets Act); *UCAR Tech. (USA) Inc. v. Li*, No. 5:17-cv-01704-EJD, 2017 WL 6405620, at *3 (N.D. Cal. Dec. 15, 2017) (applying DTSA and California Uniform Trade Secrets Act).  However, "[t]here are key differences between the DTSA's language and the language of other trade secret statutes." *Brand Energy & Infrstr. Servs., Inc. v. Irex Contracting Grp.*, Civil Action No. 16.2499, 2017 WL 1105648, at *3 (E.D. Pa. Feb. 24, 2017).  Most courts in which the doctrine has been applied to DTSA claims have not directly addressed the DTSA requirement that an injunction must be "based on evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(ii)(I).

When the court in *Kinship Partners* assessed the language when considering the question of whether the inevitable disclosure doctrine applies to DTSA claims, the court concluded that "DTSA specifically forecloses courts from granting relief based on the inevitable disclosure doctrine *because* such relief restrains employment. … Based on the plain language of the statute, the DTSA provides no avenue for the Court to grant Plaintiff its requested relief." *Kinship Partners*, 2022 WL 72123, at *7 (emphasis in original).

As reflected by the court's analysis in *Kinship Partners*, resolution of the question begins with consideration of the language of DTSA.  That is, when interpreting a statutory provision, a court begins "where all such inquiries must begin: with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1056 (2019) (internal quotation marks and citations omitted).  A court "accord[s] the statutory text its ordinary meaning by reference to the specific context in which the language is used, and the broader context of the statute as a whole." *Recovery Grp., Inc. v. Cmm'r of Internal Revenue*, 652

10

F.3d 122, 125 (1st Cir. 2011) (internal quotation marks and citations omitted). The plain language of section 1836(b)(3)(A)(ii)(I) states that an injunction, the only relief Plaintiff seeks, may not issue "to prevent a person from entering into an employment relationship" based "merely on the information the person knows." Because the inevitable disclosure doctrine permits relief without any proof of actual or an identified threat of disclosure under the theory that a person with certain information will necessarily use the information at some point in his or her new employment, the doctrine allows relief based "merely on the information the person knows." The plain language of the statute, therefore, forecloses application of the inevitable disclosure doctrine to Plaintiff's DTSA-based claim requesting that the Court enjoin Plaintiff from working on Antech product offerings that are competitive with Plaintiff's products.

To the extent there is an ambiguity in the statute, a review of the development of the statute suggests Congress did not intend the doctrine to apply to DTSA claims. An earlier version of the draft legislation provided that an injunction could issue "to prevent any actual or threatened misappropriation … provided the order does not prevent a person from accepting an offer of employment under conditions that avoid actual or threatened misappropriation." S. 1890, § 2 (proposed for codification at 18 U.S.C. § 1836(b)(3)). Congress received some comments critical of the language. *See, e.g.*, Eric Goldman, et al, *Professors' Letter in Opposition to the Defend Trade Secrets Act of 2015*, at 5[3] (arguing that this language "could reasonably be interpreted to endorse the inevitable disclosure

---

[3] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2699760.

doctrine as a matter of federal law"). Congress subsequently revised the language to its present form, suggesting that Congress did not intend for the inevitable disclosure doctrine to apply.[4]

In sum, based on the plain language of the statute, the inevitable disclosure doctrine does not apply to claims brought pursuant to DTSA. Because Plaintiff seeks enjoin Defendant from working for Antech in the capacity for which he was hired based on the inevitable disclosure doctrine, Plaintiff has not alleged an actionable claim under DTSA.

### B. Plaintiff's Misappropriation Claim Under State Law

Plaintiff has also asserted a claim under the Maine trade secrets statute, MUSTA, which claim Plaintiff asserted in this Court based on the Court's supplemental jurisdiction.[5] The Court's assessment of Plaintiff's claim under DTSA does not govern Plaintiff's MUSTA claim. Congress noted that "if a State's trade secrets law authorizes additional remedies, those State-law remedies will still be available." S. Rep. 114-2. Thus, "a state

---

[4] As explained in this Court's order on Plaintiff's motion for expedited discovery, "at least one scholar has observed that the inevitable disclosure doctrine might have informed the DTSA requirement that an injunction must be based on threatened misappropriation and not merely on the information a person knows. See M. Claire Flowers, Facing the Inevitable: The Inevitable Disclosure Doctrine and the Defend Trade Secrets Act of 2016, 75 Wash. & Lee L. Rev. 2207, 2230–31 (2018) (arguing that the legislative history and plain language "indicate that Congress did not intend for courts to apply inevitable disclosure in DTSA claims")." (Order on Motion for Discovery at 6, ECF No. 30.)

[5] Title 28 U.S.C. § 1367, which governs the Court's exercise of its supplemental jurisdiction, provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).

that has adopted the inevitable disclosure doctrine can still afford injunctive relief under that doctrine for a misappropriation claim brought under state law." 1 Roger Milgrim & Eric Bensen, *Milgrim on Trade Secrets* § 5.02 (2021). Whether a plaintiff could proceed on a claim under MUSTA based on the inevitable disclosure doctrine is apparently an open question under Maine law. The issue is most appropriately decided in state court. Where Plaintiff has not alleged a claim under federal law, the Court should decline supplemental jurisdiction over Plaintiff's claim under MUSTA. 28 U.S.C. 1367(c)(1) (proper to decline jurisdiction where "the claim raises a novel or complex issue of State law."); 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction over a claim … if … the district court has dismissed all claims over which it has original jurisdiction."); *see Rodríguez v. Doral Mort. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit … will trigger the dismissal without prejudice of any supplemental state law claims.").

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendant's motion to dismiss and dismiss Plaintiff's complaint.

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 2nd day of August, 2022.